Richard A. PETTIBONE
and Christina A. Pettibone,
*Plaintiffs,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC-MD 011259D)

Oral argument was held September 10, 2003, in the Mediation Center of the Oregon Tax Court, Salem.

John R. Potter, Heurlin Potter Jahn Leatham & Holtmann, Vancouver, Washington, argued the cause for Plaintiff.

Jerry Bronner, Assistant Attorney General, Department of Justice, Salem, argued the cause for Defendant.

Decision rendered November 13, 2003.

### JILL A. TANNER, Magistrate.

Plaintiffs appeal Defendant's assessment of state income tax for tax year 2000. The issue is before the court on the parties' cross-motions for summary judgment. The court heard oral argument on September 10, 2003. John R. Potter, Attorney at Law, appeared for Plaintiffs. Jerry Bronner, Assistant Attorney General, represented Defendant.

## I. STATEMENT OF FACTS

Plaintiffs, Richard and Christina Pettibone, were residents of Vancouver, Washington, during the tax year (2000) at issue. Until November 15, 1999, Richard Pettibone (Pettibone) was employed by NACCO Materials Handling Group, Inc. (NACCO) in its Portland, Oregon, office.

In November 1999, Ronald Muller (Muller), NACCO Vice President, sent Pettibone a Release And Severance Agreement (Agreement). In early December, Pettibone wrote to Muller asking several questions about the terms of the Agreement. In responding to Pettibone's letter, Muller wrote that if Pettibone failed to sign the Agreement, Pettibone would lose his "payments representing severance, annual incentive, and long term appreciation."

After negotiations between the parties, Pettibone entered into a Revised Release And Severance Agreement (Revised Agreement) with NACCO on December 26, 1999. Under the terms of the Revised Agreement, Pettibone received payments totaling $192,607 in tax year 2000. According to the Revised Agreement, that amount consisted of a lump-sum severance payment of $67,715, a $20,781 annual incentive bonus payment, a long-term incentive payment of $102,375, and a $1,736 nonqualified retirement plan payment. In signing the Revised Agreement, Pettibone agreed to a release of any claims he had against NACCO, a

covenant not to directly compete with NACCO for a period of 18 months, and a confidentiality agreement. Both the covenant not to compete and the confidentiality provision allowed for liquidated damages in the amount of $150,000.

Defendant alleges that the entire amount received by Pettibone is subject to Oregon state income tax for tax year 2000. Plaintiffs allege that the payment received was in exchange for Pettibone's agreement to the release of any claims he had against NACCO, a covenant not to directly compete with NACCO, and a confidentiality agreement, and is not taxable because it is a "payment to a nonresident for intangible property."

## II. ISSUE

The issue before the court is whether any part of the NACCO payment received in 2000 by Pettibone, a nonresident, is taxable income subject to Oregon state income tax.

## III. ANALYSIS

Oregon has adopted the federal income tax law as a starting point for its personal income tax law. ORS 316.048.[1] In analyzing the law governing state taxable income, the court is guided by the legislature's expressed intent "to make the Oregon personal income tax law identical in effect to the provisions of the federal Internal Revenue Code [(IRC)] relating to the measurement of taxable income of individuals * * *." ORS 316.007.

The IRC has a very broad definition of gross income. Section 61(a) of the IRC states that "gross income means all income from whatever source derived." In commenting on the broad definition, the United States Supreme Court stated that Congress has exercised "the full measure of its taxing power * * * bring[ing] within the definition of income any accession to wealth." *United States v. Burke*, 504 US 229, 233, 112 S Ct 1867, 119 L Ed 2d 34 (1992) (internal quotation marks omitted; citations omitted). The Supreme Court has "also emphasized the corollary to § 61(a)'s broad construction, namely, the default rule of statutory interpretation that exclusions from income must be narrowly construed."

---

[1] All references to the Oregon Revised Statutes (ORS) are to 1999.

*Commissioner v. Schleier,* 515 US 323, 328, 115 S Ct 2159, 132 L Ed 2d 294 (1995) (quoting *Burke,* 504 US at 248) (internal quotation marks omitted).

█        With respect to the State of Oregon's ability to tax the gross income of a nonresident, the legislature has enacted the following provisions:

> "The taxable income for a full-year nonresident individual is adjusted gross income attributable to sources within this state determined under ORS 316.127 * * *."

ORS 316.130(1). ORS 316.127 provides, in relevant part:

> "(1)    The adjusted gross income of a nonresident derived from sources within this state is the sum of the following:
>
> "(a)    The net amount of items of income * * * entering into the nonresident's federal adjusted gross income that are derived from or connected with sources in this state * * *
>
> "* * * * *
>
> "(2)    Items of income * * * derived from or connected with sources within this state are those items attributable to:
>
> "* * * * *
>
> "(b)    A * * * profession or occupation carried on in this state * * *"

Although there is limited Oregon case law interpreting those statutes, the Tax Court held that ORS 316.217 "taxes a nonresident's income from an occupation only to the extent services are rendered in Oregon." *Ballard v. Dept. of Rev.,* 13 OTR 201, 204 (1994).

A.    *Severance*

█        Defendant alleges that the entire amount of the NACCO payment made to Pettibone was for severance, specifically for personal services rendered in Oregon. "[S]everance pay, like other forms of compensation for services, is generally includable in the income of the recipient." *Dahlgren v. Commissioner,* 75 TCM (CCH) 1643, 1646 (1998)

(citations omitted). Courts have held that even though severance payments are not paid for specific work actually done, the payments are compensation paid within the broader employment relationship and often calculated based on the years of employment and rate of pay. *See Abrahamsen v. U.S.*, 228 F3d 1360, 1363 (Fed Cir 2000) ("[P]ayments reflected an amount associated with the employee's work record."); *Associated Elec. Co-op., Inc. v. U.S.*, 226 F3d 1322, 1327-28 (Fed Cir 2000) ("Payments for hard work and faithful service arise directly from the employee-employer relationship and are payments which recognize the value or character of the services performed for the employer"; method used to calculate payment is "a relevant factor in determining whether the payments constitute 'wages.' "); *Donnel v. U.S.*, 50 Fed Cl 375, 387 (2001) ("[T]he *primary purpose* of the payment was for a severance bonus, and plaintiff has failed to demonstrate an actual amount which would constitute payment for her promises contained in the Agreement * * *." (emphasis in original)).

In the case before the court, the "valuable consideration" given by NACCO to Pettibone was listed in the Revised Agreement as follows:

1.  Lump-sum Payment:   amount of payment equivalent to Pettibone's six months' base salary ($67,715).

2.  Annual Incentive Bonus:   prorated annual payment ($20,781) under the Company's Annual Incentive Bonus Plan.

3.  Long Term Incentive Payment:   appreciation of previously awarded book value units as of designated date ($102,375).

4.  NMHG Profit Sharing Plan:   distribution of all vested amounts ($1,736).

Defendant concludes that, because each of the four amounts was based on Pettibone's length of service, rate of pay, and past service rendered, the entire amount of the payment

meets the *Ballard* standard of compensation for service rendered in Oregon.[2]

Plaintiffs allege that Defendant is overlooking the purpose of the Revised Agreement and concludes that the payment was for intangible property, specifically, the release of any and all claims by Pettibone against NACCO, a covenant not to compete agreement, and a confidentiality provision. In support of their allegations, Pettibone's affidavit stated:

> "I did not work for NACCO long enough to qualify for or vest in any mandatory payments under NACCO's severance pay policy, annual incentive compensation plan or long-term incentive compensation plan. NACCO authorized and made payments to me under this policy and plans in exchange for my signing NACCO's Revised Release and Severance Agreement, which contained my release of NACCO from any liability arising out of my employment and my agreement not to compete against NACCO for 18 months."

## B. *Release*

With respect to the release portion of the Revised Agreement, Pettibone agreed to release NACCO from "all known and unknown claims, demands, actions, causes of action, rights, damages, costs, expenses and compensation whatsoever * * *." Pettibone did not list any claims (known or unknown) that he had or could have had against NACCO. In *Abrahamsen*, the United States Court of Appeals for the Federal Circuit held that a lump-sum cash payment "based on the departing employee's salary and years of service to IBM, not on the nature or magnitude of any claim the employee may have been releasing * * * associates the payments with the employer-employee relationship, and distances them from any specific claim an employee may have had." *Abrahamsen*, 228 F3d at 1365. Those factors make the NACCO payment more closely associated with Pettibone's employee-employer relationship than "any specific claim" he may have against NACCO. *Id.* Like the IBM payment in

---

[2] Defendant wrote, "If Mr. Pettibone can demonstrate the portion, if any, of his services that he performed outside of Oregon, and that OAR 150-316.127-(A)(3)(b)(A) applies, then a portion of the payment would not be taxable by Oregon."

*Abrahamsen,* the Revised Agreement supports Defendant's conclusion that NACCO's payment was based on Pettibone's salary, years of service, and past service rendered to NACCO.

## C. *Covenant not to Compete and Confidentiality*

■ In addition to the release of claims, under the terms of the covenant not to compete (noncompete provision) Pettibone agreed not to "enter into employment with or provide consulting services to those companies who are direct competitors of the Company * * * or any other company engaged in the manufacturing, marketing, distribution or sale of fork lift trucks or warehousing equipment * * *." To be enforceable in Oregon, a noncompete agreement must meet three requirements. *Eldridge et al. v. Johnston,* 195 Or 379, 403, 245 P2d 239 (1952). First, the agreement must be restricted as to time, place, and activities. The NACCO noncompete provision was limited to 18 months and Pettibone could not enter into an employment or consulting agreement with NACCO's direct competitors.

Second, the employee must receive something (compensation or other benefit) in exchange for agreeing not to compete, and it must be something to which the employee is not already entitled. ORS 653.295(1) states that an agreement is "void and shall not be enforced" unless the agreement was signed by the employee at the initial offer of employment or during a "bona fide advancement," which is usually considered to be a change in job title, responsibilities, salary, or other facts. *Nike, Inc. v. McCarthy,* 285 F Supp 2d 1242, 1246 (D Or), *aff'd,* 379 F3d 576 (9th Cir 2004). In this case, the noncompete provision came at the time Pettibone was terminated. To meet the statutory requirements, NACCO offered "new and additional" compensation to Pettibone in exchange for signing the noncompete agreement. *Mail-Well Envelope Co. v. Saley,* 262 Or 143, 148, 497 P2d 364 (1972).

Third, the agreement must be reasonable. It was reasonable for NACCO not to want Pettibone to transfer his knowledge and skills to its direct competitors. To further protect NACCO's interests, Pettibone agreed to "keep all Confidential Information in strict confidence" and would "not, directly or indirectly, at any time, disclose, furnish or use any

such information for any reason whatsoever without the Company's express written consent."

### D. *Value of Provisions to NACCO*

With respect to these two provisions, the covenant not to compete and confidentiality, the Revised Agreement imposed a monetary penalty on Pettibone if he failed to comply with the terms of the Revised Agreement. In signing the Revised Agreement, Pettibone agreed that a breach of either the noncompete or confidentiality provision would entitle NACCO to "specific performance" and Pettibone agreed to "repay to the Company as liquidated damages the sum of one hundred fifty thousand dollars ($150,000), which represents a portion of the amounts paid to Employee [Pettibone] pursuant to the terms of this Release and Severance Agreement." The inclusion of liquidated damages provisions in the Revised Agreement makes it clear to the court that both the confidentiality and noncompete provisions were an integral part of the negotiated agreement signed by NACCO and Pettibone. That conclusion is supported by Muller's letter dated December 6, 1999, stating "in the event you do not sign the Release and Severance agreement, you will receive payments under the profit sharing program. Payments representing severance, annual incentive, and long term appreciation will not be made."[3] If NACCO had not expected something in return for the payment, specifically Pettibone's agreement to comply with the noncompete and confidentiality provisions of the agreement, NACCO would not have required Pettibone to sign the Revised Agreement in order to receive the negotiated consideration.

### E. *Allocation of Payment*

The difficulty facing the court is how much of the negotiated consideration should be allocated to those two provisions. The allocation of the NACCO payment to the provisions of the Revised Agreement is a question of fact, not a

---

[3] In a subsequent document, James Phillips, Vice President of Human Resources for NACCO, wrote, "If Mr. Pettibone had not agreed to the above Release and Severance Agreement our normal practice would be to compensate an individual with his length of service of 3 years with a payment equivalent to one month's salary."

question of law. The stipulated facts do not answer that question. The court must look to the evidence provided by the parties.

Pettibone's affidavit focuses on his lack of entitlement to anything other than the profit sharing plan amount. However, "entitlement" does not answer the question. Even though Pettibone had no legal entitlement to some or all of the payment, NACCO could have concluded that all or a portion of the payment was severance to compensate Pettibone based on their employer-employee relationship and Pettibone's work record. The court concludes that, in fact, NACCO did determine that a portion of the payment was severance.

NACCO reported the entire amount as compensation on a W-2 Wage and Tax Statement. However, according to the Revised Agreement, NACCO concluded that the lump-sum payment equivalent "to six months' base salary" was subject to the "standard federal and state income tax, social security, Medicare and other standard withholdings and deductions [collectively, employment taxes]." In the Revised Agreement, the same language does not appear in reference to the annual incentive bonus, long term incentive payment, NMHG profit sharing plan, or any other section of the document.

■■ In order to be subject to employment taxes, specifically social security or FICA, "payments *must be remuneration for services* provided by the employee to his employer." *Donnel*, 50 Fed Cl at 382 (citations omitted; emphasis in original).[4] The Revised Agreement stated that only the six months' base salary was subject to employment taxes. The court concludes that, based on the income subject to employment taxes, this portion of the payment was for services.

---

[4] "[I]n the view of the IRS, payments to relinquish rights under a contract are not wages for FICA purposes." *North Dakota State Univ. v. U.S.*, 255 F3d 599, 604 (8th Cir 2001). "Wages" is defined by IRC § 3121(a) to mean compensation paid by the employer to the employee **for services performed by the employee** for the employer. The definition in the Regulations is essentially the same.

[5] ORS 305.575 grants the court the authority to "determine the correct amount of deficiency, even if the amount so determined is greater or less than the amount of the assessment determined by the Department of Revenue * * *."

The amount in excess of the lump-sum payment for severance was income to Pettibone, not for services rendered, but for agreeing to the noncompete and confidentiality provisions.[5] Following the holding in *Ballard,* the portion of the payment that was not for services rendered in Oregon is not taxable to Plaintiffs because they were nonresidents.

## IV.  CONCLUSION

Now, therefore,

IT IS THE DECISION OF THIS COURT that Defendant's Motion for Summary Judgment is denied in part and granted in part;

IT IS FURTHER DECIDED that Plaintiffs' Motion for Summary Judgment is denied; and

IT IS FURTHER DECIDED that the portion of the payment in excess of the six months' base salary ($67,715) was not severance paid to Pettibone for services rendered in Oregon and cannot be taxed to nonresident Plaintiffs.

---

[5] ORS 305.575 grants the court the authority to "determine the correct amount of deficiency, even if the amount so determined is greater or less than the amount of the assessment determined by the Department of Revenue * * *."